# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| v. | ) | No. 2:11-cr-47-DBH |
| | ) | |
| MICHAEL R. THOMAS, | ) | |
| DEFENDANT | ) | |

## DECISION AND ORDER ON MOTION TO SUPPRESS

In this 2011 criminal prosecution, the defendant moves to suppress a DNA profile obtained by a grand jury subpoena in 2005. After an evidentiary hearing[1] and oral argument on September 7, 2011, I conclude that if there were inadequacies in the 2005 legal process that obtained the DNA profile, the exclusionary rule does not call for its exclusion in this new and unrelated 2011 charge for criminal conduct that occurred in 2010.

### FACTS

In June 2004, a private school in Massachusetts received a hand-printed envelope containing white powder[2] and a sheet of paper with the words "BOOM' Guess Who" typed on it. Gov't Ex. 1. Attention centered on this defendant as the sender of the powder for a number of reasons: he was an

---

[1] Many facts were stipulated. Stipulation of Facts (Docket Item 44); Stipulation of Facts Gov't Ex. 7.
[2] The powder turned out to be baking soda. December 14, 2004 Ltr. from Michael Desrosiers U.S. Postal Inspector to AUSA Jon Chapman (Docket Item 44-3).

alumnus of the school; he was the only alumnus, or one of only a few alumni, in the region of Maine that the envelope's postmark revealed to be the origin of the letter[3]; he sent another hand printed envelope to the school about four months later postmarked Madawaska, Maine, giving his name and return address in Madawaska, processed by the same postal processing plant as the previous letter (this letter was a statement of religious disaffiliation and a request to stop sending materials); and the handwriting on the two envelopes appeared similar to a school employee. Stipulation of Facts ¶¶ 1-4 (Docket Item 44).

As a result, in December 2004, a postal inspector asked the U.S. Attorney's Office in Maine to issue a grand jury subpoena to this defendant for handwriting exemplars, fingerprints, and DNA. Stipulation of Facts ¶ 5 (Docket Item 44); Gov't Ex 6. Although no grand jury investigation of the defendant was yet underway, an assistant United States Attorney obtained a subpoena from the Clerk of this Court dated January 18, 2005, directing the defendant to appear before the federal grand jury in Bangor, Maine, on February 7, 2005, at 9 am, and to bring handwriting exemplars, fingerprints, and a saliva sample. Stipulation of Facts ¶ 6; Gov't Ex 3. A postal inspector served the subpoena on the defendant at his home in Madawaska on January 19, 2005. Gov't Ex 3. The subpoena stated: "You can comply with this subpoena by providing the above items directly to the United States Postal

---

[3] The stipulation states that an individual who was employed at the school "recalled [in 2011] that [when she reviewed the alumni database back in 2004] she found a few names but considered that she may have found just one name." Stipulation of Facts ¶ 3.

Service." Id. In the course of serving the subpoena, the postal inspector told the defendant words to the effect of "later you can travel the 225 miles to Bangor in the winter, or you can accompany me to the police station here in Madawaska today and provide them." The inspector does not remember whether a Madawaska police officer accompanied him.

The defendant agreed to go to the police station and provide the items. The inspector obtained the saliva sample by use of a cotton swab on the inside of the defendant's cheek ("a buccal swab"). The inspector used latex gloves.

The Postal Service obtained a DNA profile from the buccal swab through a private contractor, Orchid Cellmark Laboratory (Cellmark). Stipulation of Facts ¶ 12. It was determined that no match could be made, and the defendant was not prosecuted for the powder mailing. Id.

In 2010 and 2011 threatening letters were mailed to public officials.[4] The defendant's name arose as a subject of interest with respect to these mailings on account of a more recent investigation. In the course of a joint Postal Service/FBI investigative session, attention focused on how to obtain DNA from this defendant without arousing his suspicion. A postal service inspector attending the meeting recalled the 2005 DNA profile, and retrieved the file from that investigation. The saliva sample itself had been destroyed, but the profile remained, albeit missing one page. Upon inquiry the inspector learned that Cellmark had neglected to furnish that page in its original submission, and he

---

[4] The indictment says Maine Governor Paul LePage, U.S. Senator Joe Lieberman, U.S. Representative Steve King, and Wisconsin Governor Scott Walker. Indictment (Docket Item 17).

3

was able to obtain it from Cellmark. The DNA profile from 2005 matched a DNA profile obtained from one of the threatening letters to Governor Paul LePage. An FBI agent used this match to obtain two new search warrants on March 24, 2011 as a result. Id. ¶ 16; United States v. Thomas, 2:11-MJ-49-JHR and 2:11-MJ-50-JHR (Docket Items 1) (D. Me). The ensuing search of the defendant's apartment and his arrest resulted in seizure of a number of pieces of incriminating evidence, a weapon, and a confession by the defendant concerning the 2010 mailings. Stipulation of Facts ¶¶ 17-18.

On April 12, 2011, a federal grand jury indicted the defendant on criminal charges concerning the 2010 threats, and for being a felon in possession of a weapon. He has moved to suppress the original DNA profile, all evidence obtained pursuant to the 2011 warrant, and the statements he made at the time of the search.

## ANALYSIS[5]

The cases are clear that a grand jury subpoena can be used to obtain handwriting exemplars and fingerprints. United States v. Dionisio, 410 U.S. 1

---

[5] I reject the defendant's argument that a new and illegal search occurred in obtaining the missing page from Cellmark. The Postal Service was entitled to that page from the outset, and no separate legal event or grand jury secrecy violation occurred by virtue of its completing its file. Thus, this case is unlike United States v. Davis, 657 F. Supp. 2d 630 (D. Md. 2009), where a shooting victim's clothing was seized at the hospital, and only later did law enforcement obtain a DNA profile from blood on the clothes in an attempt to solve another crime. (Even so, suppression was denied in Davis.) I also reject the argument that there is some separate violation in the retention of the profile. Because the defendant's DNA was not obtained pursuant to the provisions of the DNA Analysis Backlog Elimination Act ("DNA Act"), 42 U.S.C. § 14135a, his DNA profile was never entered into Combined DNA Index System ("CODIS") database, 42 U.S.C. § 14132. Thus, the method by which the DNA was retained did not violate the DNA Act. See 42 U.S.C. §§ 14132, 14135a. Moreover, the defendant has provided no support for his argument that the evidence had to be destroyed upon the expiration of the grand jury that issued the subpoena.

(1973); United States v. Mara, 410 U.S. 19 (1973). But the defendant's challenge here is to use of the grand jury subpoena to obtain DNA. For DNA, the cases are divided, with different conclusions about the grand jury's role (vis-à-vis the AUSA who here issued the subpoena without any knowledge by the grand jury[6]), the court's role (as in pre- or post-review of the basis for the subpoena), and the standard (probable cause or less[7]) for obtaining DNA under compulsion.[8] Because, like blood, DNA arguably[9] is not generally exposed to

---

[6] United States v. Santucci, 674 F.2d 624 (7th Cir. 1982), recognizes the latitude accorded an Assistant United States Attorney in using a grand jury subpoena to prepare for grand jury sessions.

[7] Grand jury subpoenas are not subject to the same type of Fourth Amendment scrutiny as a search warrant. In re Vickers, 38 F. Supp. 2d 159, 162-63 (D.N.H. 1998). Some cases say that the standard is not probable cause, but only "whether the subject matter and scope of the subpoena are reasonable under the circumstances, including consideration of the subpoenaed person's constitutional rights." Id. at 164. Others say that reasonable individualized suspicion is required. See United States v. Shabazz, 200 F. Supp. 2d 578, 584-85 (D.S.C. 2002); Henry v. Ryan, 775 F. Supp. 247, 254 (N.D. Ill. 1991). "[S]trip and visual bodily cavity searches must be justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons." Spencer v. Roche, 755 F. Supp. 2d 250, 260 (D. Mass. 2010); accord Swain v. Spinney, 117 F. 3d 1, 6-7 (1st Cir. 1997). At the end of the day, the answer to this question seems to be in United States v. R. Enterprises Inc., 498 U.S. 298, 297 (1991), where the Supreme Court held that probable cause is not the standard, in part because the purpose of the grand jury itself is to determine if probable cause exists. But In re Grand Jury Proceedings, 816 F. Supp. 1196, 1205-06 (D. Ky. 1993), held that a grand jury subpoena for a forced blood draw required probable cause, and required a warrant. The court distinguished R. Enterprises because that case dealt with documents. Id. at 1202.

[8] The First Circuit's decisions in United States v. Weikert, 504 F.3d 1 (1st Cir. 2007) and Boroian v. Mueller, 616 F.3d 60 (1st Cir. 2010) are not determinative of this controversy, but they are instructive. Weikert held that it is constitutionally permissible to require defendants on supervised release to provide blood samples to create DNA profiles for use in crime detection. Weikert, 504 F.3d at 18. Boroian held that the DNA could be kept even after probation ended and used for future law enforcement purposes. Boroian, 616 F.3d at 68. Boroian also held that it was not a new search to match the profiles later. Id. Although those cases were dealing with the CODIS database, there are similarities. Like CODIS the profile here could be used only for identification and did not raise other privacy interests (the actual DNA was destroyed). Indeed it is hard to distinguish use of the DNA profile, once obtained, from the use of fingerprints in matching and suggesting a suspect. To be sure, because Thomas was not an arrestee, or a convicted felon, he did not have the diminished privacy interest that Weikert discussed. But Weikert also recognized that after Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 625 (1989) drawing of blood cannot be considered significant or unusual. Weikert, 504 F.3d at 12. Surely a cheek swab is even much less of an intrusion.

[9] I say arguably because people do leave their DNA in many public places, such as by saliva on a drink container at a restaurant or a cigarette, and on hair or skin cells that fall off the body.
*(continued next page)*

public view in the manner of handwriting, fingerprints, hair, and voice, some cases find its use to be more of a bodily intrusion and subject to greater Fourth Amendment protection.[10]

What is also clear is that use of the grand jury subpoena itself is not a Fourth Amendment seizure: grand jury subpoenas may be onerous, but citizens nevertheless have an obligation to comply unless the material requested is somehow protected. Dionisio, 410 U.S. at 15-16; see also United States v. Mandujano, 425 U.S. 564, 573-74 (1976) (witness subpoenaed by the grand jury to give testimony must appear and then "must invoke the privilege [against self-incrimination]", as "the 'Constitution does not forbid the asking of criminative questions'") (citing United States v. Monia, 317 U.S. 424, 433 (1943) (Frankfurter, J., dissenting)). Thus, I reject the defendant's argument that the demands of a winter drive to Bangor created illegal compulsion or that the subpoena's offer, and the postal inspector's reiteration, of a less onerous alternative of providing the materials in the Madawaska police station change the analysis. The defendant could have challenged the subpoena by failing to appear and testing it on a resulting motion for contempt, or he could have filed

---

"DNA usually can be found in biological materials such as blood, bone, saliva, hair, semen, and urine." David H. Kaye & George F. Sensabaugh, Jr., "Reference Guide on DNA Evidence," Reference Manual on Scientific Evidence, at 143 (Federal Judicial Center 3d ed. 2011). "DNA typing has been performed on old blood stains, semen stains, vaginal swabs, hair, bone, bite marks, cigarette butts, urine, and fecal material." Id. at 151. See, e.g., In re Grand Jury Proceedings, 686 F.2d 135, 139 (3d Cir. 1982) (scalp hair and facial hair are like voice and there is no Fourth Amendment interest). But here, to obtain the saliva, the postal inspector did invade the defendant's mouth.

[10] See In re Vickers, 38 F. Supp. 2d 159, 166-67 (although hair samples do not require a warrant or probable cause, saliva does implicate the Fourth Amendment unlike hair); Shabazz, 200 F. Supp. 2d at 584-85 (obtaining saliva from a buccal swab is a search); Henry, 775 F. Supp. at 254 (saliva more like blood than handwriting and hair).

6

a motion to quash the subpoena and tested it in that way. In short, the postal inspector was unable to obtain the swab without the defendant's consent (he was not an arrestee), and the grand jury could obtain it by compulsion only after some form of judicial review.[11]

It is unclear, however, whether I should analyze the defendant's compliance with the subpoena under the standards of voluntary consent,[12] or waiver of a known constitutional right.[13] In that connection, the government wants me to take into account the defendant's previous involvement with law enforcement to suggest that he was not naïve in 2005; the defendant wants me to take into account his mental health issues to suggest that his will was easily overborne.[14] The defendant did not testify at the evidentiary hearing, and if I were to assess voluntariness or waiver now for what happened in 2005, the task would be challenging. Here, for example, the postal inspector could not remember whether he was alone or with another officer; whether there was one car or two law enforcement cars; etc.

---

[11] See Santucci, 674 F.2d at 632 ("decision to take advantage of that convenient option [complying rather than attending the grand jury session] should not justify exclusion on the basis that the grand jury, therefore, was not sufficiently involved").

[12] Schneckloth v. Bustamonte, 412 U.S. 218 (1973), made clear that the question is consent, not waiver, for a Fourth Amendment search, id. at 235, that the burden is on the prosecution to show consent, and that it is a question of fact (consent) to be determined from the totality of the circumstances. Id. at 222, 227. Knowledge of the right to refuse the search (not demonstrated on this record) is a factor, but it is not the sine qua non. Id. at 227. If I were to use the consent standards here, I would find consent.

[13] In United States v. Coppola, 788 F.2d 303, 308-9 (5th Cir. 1986), the court found that there had been a waiver for the production of documents where the defendant failed to file a motion to quash, and instead voluntarily complied.

[14] Colorado v. Connelly, 479 U.S. 157 (1986), makes clear that impaired mental condition alone is not sufficient. There must be police coercive misconduct in order to find a Fourteenth Amendment due process violation. I find no such coercive misconduct here.

Amid all this legal uncertainty, I conclude that it is best to focus on the ultimate question on the motion—whether the exclusionary rule even applies to circumstances like these. The Supreme Court adopted the exclusionary rule "to discourage the police from violating the Fourth Amendment by prohibiting them from leveraging illegal encounters into criminal convictions." United States v. Clariot, 2011 WL 3715235, *3 (6th Cir. August 25, 2011) (citing Elkins v. United States, 364 U.S. 206, 217 (1960)). If there was a Fourth Amendment violation in 2005, I assume that the exclusionary rule would have applied to a prosecution for the 2004 mailings.[15] But the Supreme Court has also said that suppression is not automatic for every Fourth Amendment violation. Herring v. United States, 555 U.S. 135 (2009). "[T]he question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." Id. at 137. I must examine the flagrancy of police misconduct, "appreciable deterrence" is the standard, id. at 141, and the benefits of deterrence must outweigh costs. "[P]olice conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Id. at 144.

What would be gained by invoking the exclusionary rule here? This is hardly the classic case of using the rule to deter law enforcement misconduct, for the activity in question at the time the subpoena issued involved investigation of the 2004 mailings, not the 2010 threats; any "misconduct" was

---

[15] Of course, the defendant was not prosecuted for them and therefore he had no occasion to invoke the exclusionary rule.

8

not flagrant or deliberate; and the postal inspectors in 2004 obviously were not focused on criminal activities that the defendant might undertake six years later. Moreover, it will be very cumbersome if the use of items in law enforcement files can be challenged years later, in a different investigation. How is a current investigator to know the circumstances of the original acquisition and therefore whether particular items of evidence can be used? The only reason for applying the exclusionary rule in this case is the philosophical notion that the evidence cannot be used because there were problems with how it was obtained. That alone is not sufficient under <u>Herring</u>.

In sum, I conclude that it would be an undue extension of the exclusionary rule to use it to exclude the defendant's DNA profile and his resulting incriminating statements in a prosecution six years later for unrelated criminal conduct.

The motion is therefore **DENIED**.

**SO ORDERED.**

**DATED THIS 30TH DAY OF SEPTEMBER, 2011**

/s/D. Brock Hornby
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**